Case No. 13-0416, Board of Trustees of the Riverdale Police-Transit Police Village of Riverdale Good morning again. Each side will have 15 minutes and the appellant can reserve time for reply. And again, I ask if you could speak up, we'd appreciate it. For the record, my name is Dick Paczalski, with me is Jeff Goodloe, we represent the Riverdale Police Pension Board. Members of the court, for the last year or so, media has consistently published stories about the pension crisis in the state and the city pension funds. Many theories have been profited as to why this crisis exists, but you do not hear anybody making the arguments that the defendant makes here. Namely, that there is no crisis because the pension funds do not have to be fully funded at this point in time, and also that no crisis exists because no one's been denied a pension and the funds are not in bankruptcy or default. Those arguments, which are the arguments the defendant makes here, just don't hold true. And if this court accepts these arguments or, for that matter, what the trial court held, it's only a matter of time before Article 3 and Article 4 pension funds are going to be in serious trouble, just like the state and city funds are now. The circuit court's ruling here will give municipalities the green light to totally ignore their annual pension funding contribution obligations. And according to the circuit court, the pension board will be powerless to do anything about it. The crucial facts in this case are not in dispute. First of all, the village admitted that from 2003 through 2010, it did not comply with the annual statutory funding mandate contained in 3125 of the pension code. Counsel, can I interrupt? I'm sorry. I have a cold and this is as loud as I can talk. We know the facts and how the actuary or the department said one amount and they did another. And we're really familiar with your briefs. This is my question. The Supreme Court has kind of spoken on this in Sklodowsky and the other matters. Tell us how we can say the Supreme Court is wrong in their analysis that there's no right to specific funding. Okay, the Supreme Court spoke about it in two cases, McNamee versus the state and the people at Sklodowsky. The trial court held that McNamee was not applicable. Instead, it relied on Sklodowsky, which was never cited by the defendants in the summary judgment submission. The critical difference between Sklodowsky and this case is Sklodowsky was brought under the pension protection provision of the Illinois Constitution. Our case is brought under Section 3125 and Section 3127 of Article 3 of the pension code. Sklodowsky never mentions 3125 at all, doesn't deal with it. All Sklodowsky says is under the Constitution, you don't, a pension fund doesn't have an expectation to a specific funding level. Here, we have an expectation and a right to have an annual pension contribution made by the municipality. According to a formula, so throughout the years, at a certain point in time, the pension fund will be fully funded. And it's clear that the village of Riverdale ignored that. They pulled the contributions out of thin air here. And as a result, there's over a million dollars owed to the funds because of this transgression. And that's the difference between Sklodowsky and this case. We're not basing anything on the Illinois Constitution. We're basing it on the clear and expressed language in 3125 that requires the municipality to make annual contributions according to a set formula. And it wasn't done here. And secondly, what has been glossed over to make the compound matters, when the village underfunded, they admitted that they didn't even turn over the tax levies that they funded. They kept the money and used it themselves. And we believe what the trial court here basically did is decide this issue on an argument that was never raised by the defendant. Once again, the defendant's arguments were, under McAmey, you can't sue, and since no one's been denied benefit and the funds aren't in default, you have no remedy. The remedy, of course, is in what 3125 requires on an annual basis. And the standing question that the court basically proffered a sua sponte was answered in the Evanston case. Evanston versus Police Pension Fund versus the City of Edmonton specifically says that a pension board, a police pension board, has the right to file a declaratory judgment action to determine if the city of Edmonton has the right to pay a pension. Whether or not the municipality is living up to its funding obligations. In addition, 1115, which was never addressed by the appellate court, our circuit court, and was never argued because the standing issue wasn't before, you know, wasn't briefed at all. 1115 specifically allows fiduciaries, beneficiaries, and participants of a pension fund to sue for any violation of any provision of the pension code. And that's what we did here. The provision that was violated was 3125. And that's the sum and substance of our case, and that provision allows us to maintain that litigation. As does the Evanston case. If the court should find that 1115 does not apply, we still would have the implied authority to maintain a cause of action for delinquent contributions based upon the four-part test of Rogers versus St. Mary's Hospital, which we discussed on pages 26 and 27 of our brief. In addition, trustees have a fiduciary duty to seek delinquent contributions if a municipality, or for that matter, under ERISA, an employer, doesn't make the necessary pension contributions. There's a duty on the trustees to rectify that situation. And that's what we tried to do here. Summary judgments should also not have been granted in this case because contested issues of fact existed as to damages here. The village's actuary said there was no actuarial damages. He also indicated that actuarial damages are something different than financial damages. And he could not comment whether there was financial damage here or not. Our expert witnesses indicated that there was financial damage to the fund. Does that question of fact go to the liability or the ability to bring the suit as opposed to what could be recovered should there be some type of liability established? Well, yeah, and I think we did, but it would seem to me that before a summary judgment could be granted, you know, on the whole case, there could not be any contested issues of facts. And I believe that were contested issues of fact here as to damages. Also, once again, the record is clear that the village admitted it failed to live, abide by the funding, annual funding requirements of 3125. And it also admitted that it received tax levies and didn't turn the money over to the pension fund. It converted the money. And we filed a motion for partial summary judgment as to liability. The court denied that motion without any explanation. Now, the village has filed some supplemental authority, and I don't think it applies. That supplemental authority deals with an amendment to the state systems in light of the current crisis that is present out there. And essentially, all that amendment does is get around the issue of sovereign immunity and allow suits to be brought against the state of Illinois. It has nothing to do with Article III of the Pension Code, nor does it address or diminish the right to bring litigation under 1115 of the Pension Code. For the reasons stated and for matters in our brief, we believe the court should reverse the grant of summary judgment to the defendant and grant the Pension Board's motion for partial summary judgment as to liability and remand the case.  Thank you. We're here to discuss, obviously, Judge Valdemira's order and opinion granting the village's motion for summary judgment. At issue is whether the Riverdale Police Pension Board has a vested contractual right to enforce statutory funding levels under Article III of the Illinois Police Pension Code. And we agree, obviously, with Judge Valdemira's opinion that the answer to that question is no. Initially, I would like to just go to the point of standing that we raised in our briefs. We raised that issue in our briefs. We don't believe that there's any case or controversy for this panel to actually consider that the Pension Board had no right to even bring a lawsuit. We raised that as an affirmative defense, which is found in the record at C-262, and we also raised it in our motion for summary judgment, primarily relying on our Tupper, the expert testimony, that there was no measurable actuarial damages. The trial court disagreed, said that we didn't raise the issue. It's at the end of his detailed, well-reasoned, 15-page opinion. But even if we didn't raise it properly and we believe that standing was, we don't believe that it is waived. It's standing since it is a matter of subject, a matter of jurisdiction. We raise it any time we bring it in our brief, and we rely on People v. Capital News for that position. But going on beyond standing, Your Honors, we are here to discuss Article III of the Pension Code. Pension Code is very thick. There's 17 separate articles. There's 17 separate pension funds within the Pension Code. We are here to address Article III, Sections 1-115, Civil Enforcement, 3-125, Financing, 3-127, Reserves, and 22-403, the Purpose of the Fund. In looking at all of those sections, the trial court found that those sections were unambiguous. Therefore, he disconsidered the plain and ordinary language of those sections. The trial court considered this to be a case of first impression. We did cite to McNamee for our position in the court in reviewing the briefs, considered this to be a case of first impression on whether or not participants or beneficiaries or, strike that if a pension board, can bring a lawsuit to enforce funding levels within the fund. After looking at the case law, the court did cite to the Illinois Supreme Court cases of Lindbergh and Skidowski, and applied the same analysis that was used in Skidowski to render the decision that there is no indication in the Pension Code that the legislature intended to create a vested contractual right in statutory funding levels for the pension board. In Skidowski, counsel just stated they did not make mention of the Pension Code. I would direct this Court's attention to the last paragraph of the Supreme Court's decision wherein the Supreme Court states, in addition, the funding provisions contained in the Pension Code do not even convince a legislative intent to create vested contractual rights in favor of beneficiaries. Certainly, Skidowski, the Illinois Supreme Court considered the Pension Code, but it also did its analysis of the pension protection laws of the Illinois Constitution. We also, and it was granted earlier this week, we supplemented our briefing. And the reason we supplemented our briefing, and was allowed by this Court, is to bring forward to this Court's attention the Pension Reform Act, which the state legislature just passed recently, and it becomes effective on Monday, June 1st of this year, and it was passed to address, in the language of it, to address the fiscal issues facing the state and its employees. It's interesting that it only applies to four, the General Assembly, state employees, state universities, and teachers. But what the legislature did was they gave an express right for those four articles to be able to bring a lawsuit to question or enforce the funding levels of their pension fund. And it's a little complex, but in essence, they write a letter if they don't believe that the funding's appropriate, and it goes directly to the Illinois Supreme Court. And if the Illinois Supreme Court rules that they have not qualified or not sustained the appropriate level of funding, the Illinois Supreme Court is to issue an order that goes directly to the state comptroller, and in a matter of time, in sequence of vouchers to be written to the pension fund from the state. It's important to recognize and to think about why that recent enactment impacts this case and it bolsters the trial court's decision. It completely refutes the appellant's arguments that there is express authority contained in the Article 3 that a pension board can bring a lawsuit. Is there a distinction to be made, though, for the funds that were actually levied for pension fund purposes but yet not paid over to the fund? I mean, is the issue a little different for that? I mean, if the village went ahead and levied certain funds that were earmarked to be sent to the pension fund and they were not, is the issue a little different for those kinds of monies? And the appellants in the reply pouch it as, we're not going after the funding levels. We're looking for enforcement of Sections 3-125 and 3-127. But if you even look at the titles of those sections, it involves financing and reserves. Those are funding level issues that you have to jump over that hoop before you can get to analyzing and bringing a lawsuit to enforce those provisions. They're doing exactly what they're not allowed to do is to bring a lawsuit to enforce Sections 3-125 and Section 3-127. It pertains to the financing. Well, a lot of it was based on a philosophy, if you will, that the legislature still, the legislative body still had discretion to determine what the appropriations would be for each annual, how they would fund or how much they would fund. There was still discretion with the legislative body, but this legislative body exercised its discretion, collected monies for the fund, and then didn't turn over the money. That is correct. And if you look at the record and essentially you look at all these actuarial reports, you either get it from the Department of Insurance or the pension board gets their own actuarial report or the village does, it's a moving target. It changes from one week to the next if it were to be done, particularly in a small community such as Riverdale. It completely changes if an officer goes on a disability pension. It completely changes if there's a rash of retirees who decide to retire at age 50 or 55. The numbers completely change and it is unfortunate that monies were levied for and the village didn't transfer all those monies to the pension fund, but there's a whole reason for that. It's basic finance of the municipality. Municipalities, it's unfortunate, they're restricted on the type of revenues that they can raise. They're not IBM or corporate America. They rely primarily on sales tax revenue and they primarily rely on real estate tax revenue. Other than that, they're restricted by tax caps. They can't every year increase the taxes that go on people's property tax bills beyond 5% or they have to go to referendum. And then other increases on property taxes, where they get a sizable portion of the revenues, are subject to PTEL. And PTEL has a number of exclusions that allow municipalities to increase the property taxes beyond the tax caps. But the appellate courts in the state have ruled, it's the village of Silver Grove, I believe, the county clerk reduced the tax levy amount in the village. The village filed a lawsuit to recover that reduction, to get that money, to put it into the police pension fund. The appellate court held that police pension funds are not an exception to PTEL. So there's another restriction that municipalities can't increase the funding. And if you look at the funding, I thought it was very telling in the IML's brief as far as the history of funding. And it's not just funding by municipalities that is at issue or the cause of underfunding of the pension funds throughout the state. And if I may just briefly go over, and it's contained in page 3 through 5 of their brief, they discussed the 350 pension funds, police pension funds in the state. As of 2010, the average funding level of all those funds was 54%. And through the years, despite paying increasing amounts to the funds, the funds level of underfunding continues to grow. Municipal taxes paid in an aggregate amount starting in 1988 was $51 million per year. And that climbed to $285 million per year in 2010. Despite that huge increase in aggregate funding from those municipalities to police pension funds, the unfunded liability increased from $458 million to $4.4 billion. The amount of taxes to fund those pension funds increased by 459%, yet the unfunded liability increased almost double to 861%. The problem isn't just funding, it's restriction on municipalities by other laws that are on the books as far as raising revenues. Benefits have increased in these pension funds, COLAs, number of employees that get disability pensions. Once they're entitled to a disability pension, which they're entitled to, their contributions stop. So that affects all the assumptions that these actuaries talk about. Tax caps, as I talked about in detail, affect the funding levels. If I may interrupt, I'm sorry. You talk about the actuarial issue. The board of trustees of the police funds of the city of Evanston case seems to indicate that although there is still discretion with the legislative body, that they still need to exercise it with their own actuarial basis or foundation. Is that correct? Well, my reading of the Evanston case, it was remanded. There was a question of fact, and I don't know what happened on remand. I don't believe that case stands for that a pension board has standing or the ability to bring a funding level lawsuit. But as far as does a community have to have their own actuary, I can tell you based upon our representation of handfuls of municipalities, in recent years, just based on the cost of an actuary, which isn't much, it's about $5,000, but for these smaller towns, it's a big hit. What they've done is they've agreed to use the actuary from the police pension board. They have agreed to share the cost. It's either you go that route or you take the figure that comes from the Department of Insurance. But then it takes you to section 125 and 127, which lays out what has to go into how it's supposed to be funded. But the legislature has, at least twice now, continued the period of when the pension funds have to be fully funded. So the issue clearly is not ripe, it's not germane here, because as of right now, every police pension fund has until 2023 to be fully funded. And fully funded in the actuary world is only 90%. So it's our position that there are no injuries. There have been no harm to any of the members or participants of the Riverdale Police Pension Board. They have not missed one pension payment. They are not on the verge of bankruptcy. There's no imminent default looming over the horizon. They've gotten the numbers. They've gone under the numbers of what was the recommendation of the levy. But they have time, under the statute, to pick that up. In the event that there is a bankruptcy or imminent default or a missed payment, that is when a participant or a beneficiary has a cause of action. So there is an available remedy to the members. But the pension board themselves, they're an administrative body. They should not be able to come before a court and get a ruling that this much more money has to be put into the fund. That affects the whole runnings of a municipality. And it's unfortunate that the state, the cities, the towns throughout the state, aren't able to provide or fund all the monies that are recommended by an actuary. However, that's just a reality based upon running a municipality. You have rising insurance costs. You have water main breaks. You have uncertainties. You have squad cars that you need to replace. You have fire engines that run about 40 miles per hour. You have a lot of other things. You have $500,000, $600,000 that go down and you have to replace it. They just don't have the money to do everything. And so some years they have to go under. But they know, they realize that at the end of the day, if there is an end of the day, whenever that's going to be, it has to be fully funded. And in the event that there was no payment made, again, or default or imminent bankruptcy, the participants, they have the protection of not only the vested contractual right that's been established by the United States Supreme Court, they also have the Constitution behind them to get their payments. Everyone's very fearful of what's going on with these pensions. I trust that it's going to be straightened out, but it has to be straightened out in Springfield. You keep arguing about various expenses and costs that Riverdale has to undertake, but was this not a direct violation of 22-403 that's dealing with tax levy, that if an entity is going to levy for taxes, that it is not for the corporate purpose of such tax levy? Are they not in violation of that? Utilizing it for their own purposes as opposed to addressing it? Your Honor, as I read that section, I think that section that once the funds are transferred to the pension fund, that is pension fund money. There's no way that the corporate authorities can reach into that fund and use money. But as long as they hold on to it and don't send it to the pension board, then they can do what they want with it. That is how I interpret that section, that once it goes into the pension fund, it's pension fund. And there's been changes in the law that now the county treasurer now transfers the money directly to the pension funds based on certain tax levies and if resolutions are passed to that effect. I think the question is, did the trial court properly analyze this case? And I believe that the trial court properly analyzed it under Skidowski. And although Skidowski again dealt with the pension protection clause, Skidowski states, Your Honor, only the Supreme Court states that there's a presumption that laws do not create private contractual infested rights. It's their burden to overcome that presumption. They didn't do it at the trial court and they haven't done it here. Also, I think it's important to note the language from Skidowski where the Supreme Court stated that the framers, and again, it's to the pension protection clause, but if you read that along with the pension code, which Skidowski mentions, that the framers were careful to craft pension protection clause to create contractual rights to benefits while not freezing the politically sensitive area of pension funding. There has to be some leeway. There's got to be some judgment to the elected officials on when they levy so much money. If it's a million, $3 million a year, it's got to go towards police, fire, public safety, public works, infrastructure, streets, roads, sidewalks, as well as the pension funds. But the Supreme Court realized that it's a sensitive area and you can't freeze out that decision making. If you wouldn't mind wrapping. Oh, I will. I'm glad I have to wrap it up because I would rely on my arguments that are in my brief as far as legislative construction and the various doctrines, the Latin doctrines that we argue, the inclusio, unius, escrio, altruis, and the rest. And I trust you've seen those and are well familiar with them, and I'm glad I don't have to go through them. And as far as I don't believe there's any implied right to sue, that is detailed in our brief, certainly based upon Skidowski and the recent amendment under the Pension Reform Act. There's no express. There's no implied right to sue. And the trial court was correct in granting the village's motion for summary judgment. And I guess the relief that I would state to counsel and to his clients is to go to Springfield, try to get the same amendment to Article 3 that's been put in the four articles that come into effect next week, that they get the right to sue. I would ask when they're down there, ask the legislature to change the tax cap provisions and P-TEL, allow the communities to actually increase their taxes for a certain period of time to get additional funding for the police pension fund and the fire pension funds. Thank you for your time. Thank you, counsel. What the village is telling us is we don't have to follow the statute. We can keep tax levies that belong to the Pension Board, and you can't do anything about it. Now, to me, there's something awfully wrong with that contention, and I want to read the last sentence of 3-125. It talks about the tax levy amounts. The tax shall be forwarded directly to the treasurer of the board, meaning the Pension Board, within 30 days after receipt. That was not done here. Now, counsel is correct. As it stands now, we get the money directly from the county. But back when the period in question, that didn't happen. It went to the municipality, and the municipality has admitted that it didn't turn it over. It converted the funds. And if we follow the trial court and we follow the village's argument, nothing can be done. In this case, it's admitted that, A, they didn't use an actuary. B, they just pulled random amounts out of the air. Three years in a row, they leveraged the same amount of money. And then, C, they didn't turn it over. This case isn't about funding levels. If this was a suit about funding levels, the complaint would state that the village of Riverdale should be 60 percent funded at this time or 80 percent funded at this time. That's not what we allege. We allege that there's a mechanism that annually requires a contribution amount, and the village ignored that mechanism. It's not funding level. It's a statute that requires the village to do certain things, and they admittedly didn't do it. Counsel says that the time to deal with this is when the fund goes bankrupt. It's too late. If the fund is in default or goes bankrupt, nobody's getting a pension. That's too late. And that's why the legislature made an annual requirement. So each year, there's an obligation to make a contribution. So we don't have what we have in the state funds now, or even we have in Riverdale, where the amount of underfunded liability mushrooms and mushrooms. Yeah, they don't have to be fully funded until the year 2033, but what happens at that point in time when instead of a million dollars being owed, there's 60, 70 million dollars being owed? Where's that money going to come from? The answer is it won't. And the other problem that we have here is the burden that's placed on taxpayers. You have an annual funding requirement, so the residents can pay for their police protection on a yearly basis, and when you don't pay for it on a yearly basis, the newer residents that come in will be stuck paying for it when they weren't even there. So the annual funding requirement is necessary to make sure residents that enjoy the police protection pay for that service. To defer that for 10, 12, 15 years, you've got a whole new set of taxpayers in there that weren't even around to enjoy the police protection. That's unfair. If we're short right now and the council says there's no damage here, there is damage. We've lost the use of $1.6 million that should be in the fund, should be invested, and would be bringing down our unfunded liability. Instead, that unfunded liability is getting larger and larger and larger. And again, according to the trial court and according to the village, we can't do anything about it. I think that's wrong. I think it's a clear contravention to what 115 says and what 125 says. So once again, we would ask that the trial court be reversed, and I'll let you be granted. Thank you. Thank you very much. The matter will be taken under advisement.